Carl E. Kehret v. Commissioner. Carl E. Kehret and Mathilda Kehret v. Commissioner.
Kehret v. Commissioner
Docket Nos. 86286, 86287.
United States Tax Court
T.C. Memo 1962-188; 1962 Tax Ct. Memo LEXIS 120; 21 T.C.M. (CCH) 1035; T.C.M. (RIA) 62188; August 7, 1962
Raymond B. Ondov, Esq., 218 First National Bank Bldg., Austin, Minn., and R. C. Alderson, Esq., for the petitioners. Donald W. Wolf, Esq., for the respondent. MULRONEY Memorandum Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioners' income tax and additions to tax in these consolidated cases for the years 1946 through 1952 in the following amounts: Carl E. Kehret - Docket No. 86286
Additions to Tax
Sec. 291(a)
Sec. 293(b)
Sec. 294(d)(1)(A)
Year
Deficiency
I.R.C. 1939
I.R.C. 1939
I.R.C. 1939
1946
$ 416.26
$ 208.13
$ 37.47
1947
3,726.69
$ 559.00
1,863.35
335.41
1948
18,047.51
9,023.76
1,624.28
1949
6,962.82
1,044.42
3,481.41
626.65
Carl E. Kehret and Mathilda Kehret - Docket No. 86287
1950
$ 4,922.60
$ 492.26
$2,461.30
$ 443.05
1951
3,373.52
168.68
1,686.76
303.62
1952
1,875.30
93.76
937.65
161.49
*121 At the close of the trial in this case the Court ruled that petitioners had not filed false or fraudulent income tax returns for any of the years in question within the provisions of section 276(a), Internal Revenue Code of 1939, [1] and consequently respondent's determinations of deficiencies for said years were barred by the provisions of section 275(a). Carl E. and Mathilda Kehret are husband and wife and they have five sons. They live on a farm near Austin, Minnesota. Carl filed his individual income tax returns for the years 1946 to 1949, inclusive, and the joint returns with Mathilda for the years 1950 to 1952, inclusive, with the then collector and/or district director of internal revenue at St. Paul. Carl was born on a farm near Nashua, Iowa, in 1905. He was one of 12 children and his schooling consisted of something less than the eighth grade in a country school. In 1930 Carl's parents and all of their children moved to one of the (approximately 25) farms owned by M. F. Banfield Corporation, located near Austin, Minnesota. The arrangement with the Banfield Corporation started as an equal *122 joint venture whereby Carl, his father and two brothers furnished horses, machinery and labor and the income and other expenses were divided on a 50-50 basis with the Banfield Corporation. During the depression years of the early thirties Carl's brothers abandoned the venture. Carl continued on with his father and by 1937 he was operating two other Banfield farms located near Austin on a similar joint venture arrangement. All of these farms were primarily dairy farms with the major crops raised thereon being suitable for livestock needs such as corn, alfalfa and oats. Carl continued his joint venture with the Banfield Corporation until 1947 when the Banfield Corporation, being anxious to get out of the dairy farm operation, sold its one-half interest in a dairy (Carl had earlier acquired the other one-half interest) to Carl, and Carl began paying rent to the Banfield Corporation on a cash rent basis. Carl gave the Banfield Corporation his note in the sum of $10,000 for the purchase price and jointly owned cattle were traded or exchanged. In 1949 Carl bought one of the farms from the Banfield Corporation and thereafter he operated this farm and some rented land from the Banfield Corporation *123 and also the dairy. He suffered some losses from Bangs disease amongst his cattle during the early tax years here involved. From 1931 through 1954 petitioner used the "Minnesota Farm Account Book" in which to record his receipts and expenditures and other transactions involving his farming operations. This is a single entry book developed by the Department of Agricultural Economics at the University of Minnesota. During all of said years Carl was a member of the Southeast Minnesota Farm Management Service which required all of its members to maintain the Minnesota Farm Management Account Book. This service was a research project organized and continued by the University of Minnesota and the United States Department of Agriculture in order to obtain agricultural research. The University required that the books be accurately maintained and it had field representatives that called upon the book users about four times a year to supervise the manner in which the books were being kept. Also the books were sent in to the University at the end of the year to be checked and the University had ways of checking the accuracy of the books at least to the extent of checking entries as against *124 general knowledge of grain consumption and milk production by a given number of cattle. The University of Minnesota was satisfied that Carl kept his books (which were all available for all said years) honestly and accurately. In the printed introductory statement in the account book it is stated that the book should be kept for a number of reasons including for use to "[make] out an income tax statement" and that this account book "represents the best judgment and experience of Minnesota farmers as to how to meet the above needs [referring to listed needs including the need to make out an income tax statement] in the most simple and useful manner. It is the result of tests and trials by farmers and skilled farm management workers over a long period of years." Carl has never filled out an income tax return and he lacks the educational requirements to make out an income tax return. Members of the Banfield family made out his returns for him during the years he was in joint ventures with their corporation; after that and during all of the years here involved he took his account book to a public accountant firm in Austin who did income tax work and the accountant prepared all of *125 the returns here involved. The income tax returns for the years in question properly reflected the income as shown in Carl's books, with, however, numerous errors that resulted in both understatements and overstatements of income. In these individual and joint returns for the years in question there was reported taxable income as follows: 1946
$1,956.50
1947
3,200.50
1948
(3,034.32)
1949
(3,612.46)
1950
4,516.51
1951
3,449.64
1952
1,514.91
Respondent's agents examined petitioners' income tax liability beginning in 1953 and they completed their examination and rendered their reports to their superiors in August 1955. In January of 1960 respondent, in his notice of deficiency, determined income tax liability for the years in question against petitioners based upon a computation of net worth increases, the letter stating this method was used because of "the absence of adequate records." In this computation it was determined there were understatements of income for the years in question as follows: 1946
$ 4,347.41
1947
14,867.76
1948
49,565.07
1949
30,237.56
1950
21,716.70
1951
17,433.52
1952
13,687.60
The burden is on respondent *126 to prove fraud by clear and convincing evidence. An essential element of fraud for purposes of either section 293(b) or section 276(a) is the intent to defraud the Government by calculated tax evasion. Welburn Mayock, 32 T.C. 966; E. S. Iley, 19 T.C. 631. Respondent relied upon understatements of income for the years in question as shown by comparing reported income and income computed by the net worth method. Carl kept and preserved all of his books and we share the belief of the University of Minnesota that he kept them honestly. However, it was a single entry system without much supporting data for entries, and not very well adapted for keeping dairy operations. Also the books treated dairy cattle as expense items and did not carry identification of individual cattle purchases and sales. Respondent's agents admitted the income tax returns for the years in question showed they were made up from the books. They were made up by a public accountant who was present in the courtroom but was not called to the witness stand. This means Carl would have to have made deliberate omissions or many false entries in the books to account for large fraudulant understatements *127 of income charged by respondent in the net worth computation. He made mistakes, we know, and many of them were caught and corrections made by the University employees when they annually audited the books. But the field representatives were impressed with how hard Carl struggled to keep the books accurately - and with his limited education keeping these simple books was not an easy task. There were other errors in the books which the revenue agents found (and petitioners' new auditor hired at the time of trial found) which resulted in both understatements and overstatements of income. They showed no pattern which would indicate fraud. There is no hint of any hidden cash accumulation. During all of these years Carl kept one bank account - a checking account in the First National Bank of Austin. He frequently borrowed from this bank on his note and the president of the bank and several other prominent citizens of Austin, including members of the prominent Banfield family, and others with whom Carl had done business, testified as to the reputation of the Kehrets being that of good, honest, deeply religious, farm folk. Petitioners both testified and the Court was impressed with and believed *128 their testimony. We hold petitioners did not file false or fraudulent returns with intent to evade tax for any of the years in question and consequently the deficiencies for all of the years in question are barred by the statute of limitations. Decisions will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended.↩